IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> LARRY WILSON, <br><br> Defendant. | No. 13-CR-2011 CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

### I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on August 14, 2020. (Docs. 193 & 194). On August 21, 2020, the government timely filed a resistance. (Doc. 195). On August 26, 2020, defendant timely filed a reply. (Doc. 197). On September 14, 2020, defendant filed a supplemental brief. (Doc. 200). For the following reasons, the Court **grants** defendant's motion.

### II. RELEVANT BACKGROUND

At some unspecified time, defendant conspired with T.M., M.P., and others to distribute crack cocaine. (Doc. 96, at 3). Defendant acted as a "middle man," arranging deals with customers on behalf of both T.M. and M.P. (*Id.*, at 3–4). Beginning in September 2012, defendant arranged approximately three to ten deals a month on behalf of T.M. (*Id.*, at 4). On October 18, 2012, a confidential informant ("CI") contacted defendant to purchase cocaine. (*Id.*). Defendant contacted T.M. and accompanied T.M. and the CI to two locations to acquire cocaine. (*Id.*). After T.M. sold the CI cocaine—within 1,000 feet of a park—defendant demanded five dollars from the CI for "middling" the transaction. (*Id.*). On February 12, 2013, defendant arranged for the sale of cocaine

from a source to a CI, which took place at his own residence within 1,000 feet of a park. (*Id.*). Defendant also "adamantly ask[ed]" the CI for part of the cocaine. (*Id.*). On February 28, 2013, defendant again arranged for the sale of cocaine to a CI and again asked the CI for a portion of the cocaine. (*Id.*). Defendant was, at other times, given cocaine as payment for "middling" such sales. (*Id.*).

On May 7, 2013, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute cocaine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 846, 851, and 860 and three counts of distribution and aiding and abetting the distribution of cocaine in violation of Sections 841(a)(1), 841(b)(1)(C), 851, 860, and Title 18, United States Code, Section 2. (Doc. 4). On May 16, 2013, officers arrested defendant. (Doc. 41). On May 17, 2013, defendant plead not guilty and was detained. (Doc. 34). On June 21, 2013, defendant plead guilty to one count of distributing cocaine. (Doc. 66). On July 9, 2013, the Court accepted defendant's plea. (Doc. 78).

On August 12, 2013, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 96). Defendant was, at that time, 53 years old and residing in Waterloo, Iowa, where he was also born. (*Id.*, at 2). Defendant described his childhood as "pretty good." (*Id.*, at 13). Defendant noted that his father abused drugs, although his father denied this. (*Id.*). Defendant had seven siblings, two of whom were incarcerated on federal drug convictions and one of whom was murdered. (*Id.*). Defendant had one adult daughter from whom he was estranged. (*Id.*). Defendant was illiterate, which caused him to drop out of school after eighth grade and prevented him from completing his GED. (*Id.*, at 14). Defendant had very little employment history, consisting of only a few short-term, mostly unverified labor jobs. (*Id.*). In 2001, defendant stated that manufacturing cocaine was his employment. (*Id.*).

2

Case 6:13-cr-02011-CJW-MAR    Document 201    Filed 10/05/20    Page 2 of 13

Defendant had no mental or physical conditions at the time of sentencing, but was "in need of an eye exam, dental work, and a foot examination." (*Id.*, at 13). Defendant reported minimal use of alcohol and marijuana, although records noted that he reported using marijuana daily in the past. (*Id.*, at 13–14). Defendant had tried methamphetamine on a few occasions. (*Id.*, at 14). From ages 22 to 40, defendant used cocaine weekly. (*Id.*). At age 40, he "cut back" on his cocaine usage. (*Id.*). Defendant participated in a variety of substance abuse treatment programs in the past. (*Id.*). In 2008, he was diagnosed with cocaine and cannabis dependence. (*Id.*).

Defendant's criminal history was significant. In his early 20's, defendant was convicted of, among other things, harassing a woman. (*Id.*, at 7). At age 26, he was convicted of possession of marijuana. (*Id.*). On that occasion, officers were called to a disturbance between a man and a woman involving a knife and arrived to find defendant bleeding from his arm. (*Id.*). At age 27, defendant was convicted of domestic assault after striking his girlfriend and employing a knife in some way during a dispute. (*Id.*). At age 30, defendant was convicted of possession of cocaine, at which time he also possessed a short-barrel shotgun. (*Id.*, at 8). He served a year in jail for this offense. (*Id.*). At age 32, defendant was again convicted of possessing cocaine and domestic assault involving "cuts" to a woman's face. (*Id.*). At age 33, defendant was convicted of three counts of delivering cocaine base and sentenced to ten years' imprisonment but was paroled after serving around four and a half years. (*Id.*). At age 38, defendant was convicted of possession of marijuana and driving on a suspended license. (*Id.*, at 9). Notably, he also possessed a cocaine pipe on that occasion, which occurred only six weeks after his release from prison. (*Id.*). At age 39, defendant was convicted of driving on a suspended license twice, possession of cocaine with intent to deliver, possession of marijuana with intent to deliver, and interference with official acts. (*Id.*, at 9–10). He was sentenced to 20 years' imprisonment, paroled after serving two years, revoked after

3

a year on parole, escaped for a month, paroled again two years later, revoked again two years after that, and then ultimately discharged from parole. (*Id.*, at 10). In his 40's, he was convicted of voluntary absence and theft. (*Id.*, at 11). At age 50, he was convicted of possession of cocaine and sentenced to five years' imprisonment but was paroled after serving a year. (*Id.*, at 11).

On October 9, 2013, the Court sentenced defendant. (Doc. 120). Defendant, as a career offender, was in criminal history category VI with a total offense level of 29, yielding an advisory guideline range of imprisonment of 151 to 188 months followed by three years to life on supervised release. (Doc. 96, at 6, 17). The Court ultimately sentenced defendant to 136 months' imprisonment followed by five years on supervised release. (Doc. 121). Defendant did not appeal his sentence. On June 30, 2015, the Court, on its own motion, found a reduction in defendant's sentence was not warranted in light of changes to the United States Sentencing Guidelines ("USSG"). (Doc. 163).

On June 24, 2020, defendant filed a pro se motion for compassionate release. (Doc. 175). On July 27, 2020, defendant filed a supplement to his pro se motion. (Doc. 186). After the Court appointed defendant counsel (Doc. 188), defendant filed his Motion for Compassionate Release now before the Court on August 14, 2020 (Docs. 193 & 194). Defendant is currently incarcerated at Sandstone FCI with a projected release date of February 22, 2023. *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

4

facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some

5

other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On May 19, 2020, defendant submitted a request for release to the warden of his facility. (Doc. 175, at 8). On May 26, 2020, the warden denied his request. (*Id.*, at 7). Because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

#### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his diabetic condition, stage 1 chronic kidney disease, hyperlipidemia, obesity,

6

hypertension, and breathing difficulties while lying on his back put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 194, at 7). Notably, the government "concedes that defendant's medical diagnoses present extraordinary and compelling reasons" for release. (Doc. 195, at 13). Currently, Sandstone FCI has 74 inmates positive for COVID-19 and 36 inmates that have recovered. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. No inmates have died and none of the staff have contracted the virus there. *Id.*

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also People at Increased Risk*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html. The Centers for Disease Control and Prevention ("CDC") recognizes that persons with "a chronic kidney disease of any stage" and persons with a body mass index ("BMI") in excess of 30 are at an increased risk of suffering severe complications if exposed to COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions-/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc-.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. The CDC also recognizes that persons with cardiovascular hypertension, i.e. high blood pressure, may be at an increased risk. *Id.* Although the CDC states that type II diabetes is a risk factor and type I diabetes may be a risk factor, it does not list pre-diabetes as a medical condition relevant to COVID-19. *Id.* The CDC does not list hyperlipidemia or minor breathing difficulties as actually or potentially increasing a person's susceptibility to COVID-19. *Id.* A person's susceptibility to COVID-19 also increases with their age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-

ncov/need-extra-precautions/older-adults.html. Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id.* Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id.*

Defendant is 60 years old. (Doc. 96, at 2). Thus, his age puts him at a marginally higher risk during for the pandemic, but he is not in the most affected age group of persons over age 65 or among the most vulnerable persons over age 85.

Although defendant's medical records reflect that he has hyperlipidemia, his condition is not discussed with any emphasis or concern. *See, e.g.*, (Doc. 194-1, at 19–20, 48, 55). His cholesterol levels in May 2020 were relatively normal. (*Id.*, at 65); *see also* MedlinePlus, *Cholesterol Levels: What You Need to Know*, https://medlineplus.gov/-cholesterollevelswhatyouneedtoknow.html. Moreover, the CDC does not recognize hyperlipidemia or high cholesterol as a risk factor relevant to COVID-19. Thus, the Court gives this condition little to no weight in its analysis.

Although defendant reports trouble breathing while he is lying down, his medical records never mention this condition. Even so, his records indicate his respiratory health is normal. *See, e.g.*, (Doc. 194-1, at 8, 17, 18, 30, 38); *see also* John Hopkins Medicine, *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temp-erature-pulse-rate-respiration-rate-blood-pressure#:~:text=Normal%20respiration%-20rates%20for%20an,to%2016%20breaths%20per%20minute. Indeed, although chronic respiratory issues are relevant to COVID-19, defendant's records do not mention any such issues, not even shortness of breath. In January 2020, defendant denied any history of respiratory health problems. (Doc. 194-1, at 55). Thus, the Court affords this minor respiratory issue little to no weight in its analysis.

Defendant's hypertension is notable. In July 2020, his blood pressure was 145/99, putting him in hypertension stage 2. (*Id.*, at 8); *see also* American Heart Association,

8

Case 6:13-cr-02011-CJW-MAR   Document 201   Filed 10/05/20   Page 8 of 13

*Understanding Blood Pressure Readings*, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings. In recent months, his blood pressure has constantly been elevated or in stages 1 or 2 of hypertension. (*Id.*, at 12). Moreover, this problem appears to be recent. Defendant denied having a history of hypertension in January 2020 (*id.*, at 55) and his blood pressure readings toward the end of 2019 were within normal range or only slightly elevated (*id.*, at 30, 38). The CDC only regards this type of hypertension, however, as a potential risk. On balance, given its recent and consistent nature, the Court affords this condition some weight.

It is unclear whether defendant has pre-diabetes—as he asserts—or type II diabetes—as the government asserts. (Docs. 194, at 7; 195, at 13). In April 2020, the BOP described defendant's condition as pre-diabetic. (Doc. 194-1, at 17, 20). In the same month, however, defendant is also listed as having type II diabetes. (*Id.*, at 22). Defendant is noted as a type II diabetic receiving diabetes foot care on earlier occasions as well. (*Id.*, at 23, 30, 55). One page in the record shows defendant's type II diabetes diagnosis crossed-out and replaced with "pre-diabetes" below it. (*Id.*, at 49). Pre-diabetes is not recognized as a risk factor relevant to COVID-19 but type II diabetes is. Despite this lack of clarity, defendant has at least some notable form of diabetes that the Court affords some weight.

Defendant's most recent BMI in April 2020 was 33.7. (*Id.*, at 19). Although defendant has experienced some unexplained weight loss (*id.*, 42, 26), his weight has trended slightly upward recently. (*Id.*, at 41). He has gained a significant amount of weight while incarcerated. *Compare*, (*id.*) *with*, (Doc. 96, at 2). Given that defendant's BMI exceeds the CDC's risk category of 30, although only by a small margin, this condition does increase his susceptibility to COVID-19.

Defendant's most notable health condition is his stage 1 chronic kidney disease. (Doc. 194-1, at 8, 19, 40, 55). Although this condition is not discussed with any

particular concern,[1] the CDC holds that a chronic kidney disease at any stage increases a person's susceptibility to COVID-19. Thus, the Court considers this a serious risk factor during the pandemic.

In sum, defendant's health conditions present an extraordinary and compelling reason for release, albeit marginally. Defendant does not have any single condition which itself renders him susceptible to COVID-19 in an extraordinary sense. When taken together, however, defendant has multiple avenues of vulnerability. He is slightly older and has some form of diabetes, significant hypertension, some obesity, and a chronic kidney condition. These conditions are particularly troubling in a facility that has a significant amount of COVID-19 cases.

Given these compounding conditions and the government's lack of resistance, the Court finds defendant has presented an extraordinary and compelling reason for release. The Court must now consider whether the Section 3553(a) warrant release in light of this extraordinary and compelling reason.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 194, at 10–12). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting

---

[1] Defendant's records note that a person may have chronic kidney disease if their glomerular filtration rate ("GFR") is calculated below 60 over a three-month period. (Doc. 194-1, at 65). Defendant's only GFR in the record is 51 in May 2020. (*Id.*). His medical notes, however, state that "[i]f [the patient is] African American multiply by 1.210." (*Id.*). Defendant is African American. (Doc. 96, at 2). It is unclear whether his 51 GFR already accounts for the relevant multiplication. If not, his GFR would be 61.71 and thus not below 60. Regardless, the record notes defendant has stage 1 chronic kidney disease and the parties do not dispute this fact.

compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Although it appears defendant came from a relatively stable home, his learning disabilities are a mitigating personal characteristic. His difficulties with reading and writing limited his education and, to some extent, his ability to maintain employment.

The nature of defendant's underlying offense, in isolation, is mitigating. Defendant was a "middle man" for small, individual-quantity cocaine transactions. It appears defendant's primary motivation was to skim small amounts of cash and cocaine from those involved in the transactions. Although the absence of aggravating factors is not itself a mitigating factor, it is notable that neither violence nor firearms are noted as being involved in these transactions. Admittedly, defendant participated in these transactions regularly, often near protected locations such as parks. Overall, though, defendant's role in the distribution of drugs was relatively minor and fueled by defendant's addiction.

Defendant's criminal history is the obvious driver of his sentence. With seven prior cocaine-related convictions, defendant earned his career offender status. Defendant was repeatedly convicted of domestic violence, possessing marijuana, and possessing and delivering cocaine. His cocaine-related criminal activity continued despite receiving incrementally longer sentences and having his parole revoked multiple times. His performance on parole was poor, with violations including using cocaine and marijuana,

failing to maintain employment, failing to pay fees, absconding from supervision, and incurring new criminal charges. (Doc. 96, at 10). His repeated criminal conduct—from continuing to use drugs to driving on a suspended license—shows that defendant had little to no respect for the law. Although his violent tendencies appear to be long behind him, his addiction to cocaine has perpetuated his criminal activity into his older adulthood.

Defendant has, however, performed well while incarcerated. It appears he has no recorded disciplinary violations, at least recently. (Doc. 194-1, at 5). He has worked as a psychology services clerk for more than two and a half years. (*Id.*). Despite his challenges with literacy, he enrolled in two educational courses. (*Id.*). He has completed drug education and the residential drug abuse treatment program. (*Id.*, at 6). His medical records consistently reflect that he is pleasant and cooperative. (*Id.*, at 17, 19, 24, 27, 36). Defendant has a little less than 29 months left to serve of his 136-month term of incarceration, i.e. about twenty percent.

The government is correct that "this case is a close call." (Doc. 195, at 14). On one hand, defendant's recidivist criminal history is highly aggravating and ties directly into the instant offense. On the other hand, the underlying offense itself was not violent or otherwise aggravating and defendant has served a substantial majority of his sentence. Further, defendant's violent convictions are temporally remote, he has performed well in prison, he has completed two drug treatment programs, and he has a suitable residence to go to if released. (Doc. 194-1, at 97). Notably, this is the longest single term of incarceration defendant has served. Defendant has served more than seven years of his sentence here, significantly more than his prior longest term of four and a half years (Doc. 96, at 8), although defendant has had many smaller stints of incarceration.

On balance, the Court finds that placing defendant under home detention will be sufficient to deter any residual danger he presents to the community. The primary threat defendant poses to the community is returning to cocaine-related criminal conduct. Home

detention, as well as the conditions of supervised release generally, will offer a sufficient deterrent to defendant against recidivating. If, however, defendant does recidivate, the conditions of his release will provide a swift means of reincarceration.

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 193) is **granted**. Defendant's sentence is **reduced** to **time served as of October 19, 2020**.

Upon release, defendant's conditions of supervised released are modified to include that defendant will be **monitored by radio frequency monitoring for a period of up to two years**. Defendant must **abide by all technology requirements as well as any other rules and regulations of the monitoring program**. Defendant must **pay the costs** associated with the program as directed by the Court and determined by the USPO.

This form of location monitoring technology will be used as a form of **home detention** to monitor the following restrictions on defendant's movements in the community, as well as other conditions of release: defendant is restricted to his residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the USPO.

All other conditions of defendant's Judgment shall remain the same. (Doc. 121). The Clerk of Court is **directed** to provide a copy of this Order to the USPO and Sandstone FCI.

**IT IS SO ORDERED** this 5th day of October, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa